IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | |
|---|---|
| POLY-MED, INC., ) | Civil Action No.: 8:15-cv-01964-JMC |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **ORDER AND OPINION** |
| NOVUS SCIENTIFIC PTE. LTD, ) | |
| NOVUS SCIENTIFIC, INC. and ) | |
| NOVUS SCIENTIFIC AB, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

Plaintiff Poly-Med, Inc. ("Poly-Med" or "PMI") filed this action seeking monetary damages, injunctive and equitable relief from Defendants Novus Scientific Pte. Ltd. ("Novus Singapore"), Novus Scientific, Inc. ("Novus USA"), and Novus Scientific AB ("Novus Sweden") (collectively "Novus Defendants") as a result of alleged violations of the parties' business agreement. (ECF No. 181.)

This matter is before the court pursuant to Novus Defendants' Motion for Partial Summary Judgment (ECF No. 209) on the basis that Poly-Med's "'hernia only' and 'patent application' breach of contract claims are barred by the statute of limitations." (*Id.* at 3.) Poly-Med opposes the Motion in its entirety. (ECF No. 216.) For the reasons set forth in detail below, the court **GRANTS** Novus Defendants' Motion for Partial Summary Judgment.

I.     RELEVANT BACKGROUND TO PENDING MOTION

Founded by Dr. Shalaby W. Shalaby in 1993, Poly-Med is a South Carolina corporation with its principal place of business at 6309 Highway 187, Anderson, South Carolina 29625. (ECF Nos. 1 at 1 ¶ 1 & 104-1 at 1 ¶ 3.) "Poly-Med designs, develops, and manufactures products and materials [out of bio-absorbable and biodegradable polymers] for use in medical,

1

pharmaceutical and biotechnology applications." (ECF No. 1 at 3 ¶¶ 8–9; *see also* ECF No. 104-1 at 1 ¶ 3.) "Poly-Med has numerous trademarks, more than one hundred thirty patents and patent applications and has successfully licensed and manufactured technologies found in many commercially available medical applications." (ECF No. 104-1 at 2 ¶ 5.) "In addition to creating its own products and materials, Poly-Med offers manufacturing services and consulting, analytic and research and development services to a variety of firms in the medical, pharmaceutical and biotechnology industries." (*Id.* at ¶ 6.)

In December 2004, a Swedish company called Radi Medical Systems AB ("Radi") applied for a patent entitled "Mesh Implant for Use in Reconstruction of Soft Tissue Defects." (ECF No. 126-2 at 2 ¶ 4.) Radi's goal was "to commercialize the invention in order to reconstruct soft tissue defects to promote optimal healing and tissue restoration." (*Id.*) Even though Radi "possessed the background and know-how regarding degradable polymers, polymerization, and processing into final medical devices," it "did not have all of the physical equipment needed." (*Id.* at 2–3 ¶ 5.)

In early 2005, Poly-Med began negotiations with and eventually entered into a Sale of Materials and License Agreement (the "Agreement") with Radi on or about June 8, 2005. (ECF No. 104-1 at 2 ¶ 7–4 ¶ 15.) The Agreement required Poly-Med to "develop and manufacture at least six different types of Absorbable Composite Meshes[1] for sale to and use by Radi" in

---

[1] The Agreement defined "Absorbable Composite Mesh" as "any special absorbable composite fibrous constructs absorbed by the human body for specific use in herniated tissues which (i) has not been previously sold or licensed to any other person or entity for product development or commercial application that conflicts with its use by RADI AB in its hernial mesh application; (ii) that falls within the scope of any valid claim of any POLY-MED patent or patent application; or (iii) is manufactured under or using a process that falls within the scope of any Valid Claim of any POLY-MED Patent or POLY-MED Patent Application; or (iv) comprises or makes use of POLY-MED Know-How; or (v) is manufactured under, or using a process constituting, POLY-MED Know-How." (ECF No. 126-1 at 3 ¶ 1(f).)

"hernial repair products." (ECF No. 126-1 at 4 ¶ 2(a).) Additionally, the Agreement contained the following provisions relevant to this action:

- This license shall include the right of RADI AB to arrange for manufacture of Select Absorbable Composite Hernial Meshes used in RADI Absorbable Composite Hernial Meshes with an independent manufacturing company at any location selected by RADI AB, at prices and on terms and conditions acceptable to RADI AB; provided however that (i) in no event may RADI AB manufacture, deliver or sell, or cause the manufacture for delivery and sale, of Select Absorbable Composite Meshes except for use in RADI Products for hernial repair; . . . .

(ECF No. 126-1 at 10 ¶ 6(c)

- RADI AB shall neither acquire nor possess any right, title or interest in or to the POLY-MED Know-How or other POLY-MED Intellectual Property with respect to the specific fiber combinations used in construction, creation, manufacture or production of Absorbable Composite Hernial Meshes. POLY-MED may file patent applications in the United States with respect to any Absorbable Constructs at any time, will have all right, title and interest in and to any patent applications with respect thereto, and will own any and all patents on any Absorbable Composite Mesh developed pursuant to this Agreement.

(*Id.* at 11 ¶ 7(a).

- If POLY-MED declines, after RADI AB's written request, to prepare and file or maintain a patent application with respect to a Select Absorbable Composite Hernial Mesh in a specified territory, including but not limited to the United States, RADI AB shall have the right (but not the obligation) to prepare and file or to maintain or prosecute a patent application in such territory in POLY-MED's name and on POLY-MED's behalf, at RADI AB's sole cost and expense, and shall have authority and power in POLY-MED'S name and on POLY-MED's behalf but at RADI AB's expense, to seek, file or execute (and pay the filing fees or other costs associated with) any continuations, continuations-in-part or divisionals thereof and any patents issuing thereon together with all reissues and extensions thereof; provided however that RADI AB shall in all such cases keep POLY-MED advised of the progress of any such applications, continuations, continuations-in-part or divisionals and first consult with POLY-MED about the desired course of action.

(*Id.* at 13 ¶ 8.)

- This Agreement shall be governed by and construed in all matters with respect to the validity, interpretation, legal effect and construction hereof in accordance with the laws of SWEDEN, and in all matters with respect to patent or trademark

> enforceability, validity, and infringement, in accordance with the patent or trademark laws of the relevant country.

(*Id.* at 27 ¶ 28.)

- [N]either party to this Agreement may assign its rights or delegate its duties without the prior written consent of the other party, which consent shall be in its sole and absolute discretion; . . .

(*Id.* at 28 ¶ 30(a).)

From the group of six proprietary, absorbable surgical meshes, Radi was to select one or two which it believed "hold the most promise for purposes of developing RADI Products . . . ." (*Id.* at 7 ¶ 4(a).) Radi would then "have the exclusive right to use any Select Absorbable Composite Mesh used by it in the development, manufacture, sale and distribution of its medical products . . . ." (*Id.* at 8 ¶ 5.) Per the terms of the Agreement, "Radi was to compensate Poly-Med for its development work, manufacturing and production of the mesh that took place exclusively in South Carolina." (ECF No. 35-2 at 2 ¶ 11.) In February 2007, Radi selected one prototype surgical mesh which was then developed into a medical device called TIGR®Matrix Surgical Mesh ("TIGR®Mesh"). (ECF No. 126-2 at 4–5 ¶ 14.) In December 2008, Radi transferred its rights under the Agreement to Novus Singapore.[2] (ECF No. 126-5 at 2 ¶ 4.)

Upon receipt of an application, the U.S. Food and Drug Administration ("FDA") issued 510(k)[3] clearance of TIGR®Mesh on January 25, 2010, "for surgical use in 'reinforcement of soft tissue where weakness exists.'" (ECF No. 126-2 at 5 ¶ 17.) Poly-Med helped Novus

---

[2] Poly-Med contends that it was told by Radi that the Agreement was assigned to Novus Singapore, but a "Transfer Agreement" provided to Poly-Med reveals that the Agreement transferred from Radi to Novus USA. (*See* ECF Nos. 35-2 at 3 ¶¶ 13, 15 & 35-3 at 1.)

[3] "A 510(k) is a premarket submission made to FDA to demonstrate that the device to be marketed is at least as safe and effective, that is, substantially equivalent, to a legally marketed device (21 CFR 807.92(a)(3)) that is not subject to PMA." FDA Premarket Notification 510(k), http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketNotification510k/default.htm (last visited Dec. 5, 2016). "Submitters must compare their device to one or more similar legally marketed devices and make and support their substantial equivalence claims." *Id.*

Defendants obtain FDA approval of the TIGR®Mesh by (1) maintaining their Device Master Record[4] ("DMR") in South Carolina and (2) allowing them to use "confidential and proprietary information located in South Carolina and substantial consultation, testing and assistance." (ECF No. 38-3 at 4 ¶¶ 19, 25.) After receiving 510(k) clearance, Novus Singapore began marketing and selling TIGR®Mesh. (ECF No. 126-5 at 2 ¶ 5.)

On September 27, 2010, Waleed Shalaby, Poly-Med's Chief Science Officer ("CSF"), sent an e-mail to its then President, David Shalaby,[5] in which the CSF observed that a lawyer needed to be contacted because Novus "Defendants were making, selling, and/or using the Medical Device for TRAM flap/breast reconstruction surgery[6]—. . . an application other than hernia repair." (ECF No. 209 at 7 (referencing ECF No. 209-1 at 1).) In response to this information, Poly-Med told Novus Defendants that "it objected to commercialization of the TIGR®Mesh as a 'surgical' mesh rather than a 'hernia' mesh" and allegedly demanded "firm commitments by Novus defendants on further orders for production at substantially increased prices." (ECF No. 104-1 at 16 ¶ 62; *see also* ECF No. 126-5 at 2 ¶ 7.) Then, on September 30, 2010, Poly-Med was informed by a consultant that "it could be inferred from the Novus website that the company is indicating its use for 'soft tissue repair'" and that "if Novus is indeed promoting its use beyond hernia repair, it could be argued that they have violated the terms of the license agreement and it could thus be terminated." (ECF No. 209 at 8 (quoting ECF No. 209-2

---

[4] "A Device Master Record is a compilation of all the instructions, drawings and other records that must be used to produce a product." (ECF No. 38-3 at 4 ¶ 25.) "The term is used in Quality Management Systems that cover product design and production." (*Id.*) "Under FDA regulations, a DMR must be maintained by the manufacturer of any medical device for use in humans." (*Id.* at 4–5 ¶ 25.)

[5] In August 2010, David Shalaby replaced his father as President of Poly-Med. (ECF No. 104-1 at 16 ¶ 61.)

[6] In a TRAM flap procedure (or abdominal wall reconstruction surgery), a section of the abdomen wall is removed and used in breast reconstruction and the mesh is used to repair the hole in the abdomen wall." (ECF No. 104-1 at 16 ¶ 62.)

at 6 & 7)).) On December 22, 2010, Poly-Med sent a letter to Novus Defendants containing the following language:

> Novus has commercialized the TIGR hernia mesh as a 'surgical mesh' when our agreement clearly identifies product licensure by Novus as a 'hernia' mesh only. We believe this to be a serious issue that needs to be addressed by Novus immediately.

(ECF No. 209-3 at 5.)

On or about February 27, 2013, Novus Singapore transferred its interest in the Agreement to its Swedish sister company, Novus Sweden. (ECF No. 126-8 at 1 ¶ 2.) "Since August 2014, using its own manufacturing procedures, Novus Sweden has manufactured TIGR®Matrix Surgical Mesh in its own production facilities, and has continued to sell TIGR® Matrix Surgical Mesh in accordance with the 510(k) clearance and CE registration." (*Id.* at ¶ 3.) "Novus Sweden has paid and continues to pay royalties to Poly-Med regardless of the end use of TIGR®Matrix Surgical Mesh . . . and regardless of whether Poly-Med or Novus Sweden manufactured the TIGR®Matrix Surgical Mesh." (*Id.* at 2 ¶ 5.) "Poly-Med has accepted royalty payments arising from all end uses." (*Id.*)

On May 8, 2015, Poly-Med filed a Complaint against Novus Defendants alleging four causes of action: breach of contract, tortious interference with contract, violation of the South Carolina Trade Secrets Act ("SCTSA"), S.C. Code Ann. §§ 39-8-10 to -130 (2016), and violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code Ann. §§ 39-5-10 to -560 (2016). (ECF No. 1 at 13–25.) After Novus Defendants answered the Complaint on March 14, 2016, the parties engaged in discovery. On November 22, 2016, the court granted Poly-Med's Motion for Leave to Amend Complaint (ECF No. 118) and it filed its Amended Complaint on November 29, 2016. (ECF Nos. 149, 153.) Thereafter, on July 6, 2017, the court granted Poly-Med's Motion for Leave to Amend and Supplement the Amended Complaint (ECF

No. 167) and it filed its Second Amended Complaint on July 10, 2017. (ECF Nos. 179, 181.) In the Second Amended Complaint, Poly-Med alleged claims against Novus Defendants for breach of contract, tortious interference with contract and violation of the SCUTPA. (ECF No. 181 at 14 ¶ 89–27 ¶ 160.)

On October 5, 2017, Novus Defendants moved for partial summary judgment on Poly-Med's breach of contract cause of action. (ECF No. 209.) After the parties submitted their Response in Opposition (ECF No. 216) and Reply in Support (ECF No. 222), the court heard argument from the parties on this matter on January 22, 2018. (ECF No. 231.)

## II. JURISDICTION

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) based on Poly-Med's allegations that the action is between citizens of different states and/or countries and the amount in controversy is in excess of $75,000.00. (ECF No. 181 at 1 ¶ 1–2 ¶ 4 & 3 ¶ 11.) Specifically, Poly-Med alleges that it is a South Carolina corporation with its principal place of business in Anderson, South Carolina; Novus Singapore is a Singaporean corporation with its principal place of business in Singapore; Novus USA is a Delaware corporation with its principal place of business in San Diego, California; and Novus Sweden is a Swedish corporation with its principal place of business in Uppsala, Sweden. (*Id.*) In this regard, the court is satisfied that complete diversity exists between the parties and the amount in controversy is sufficient.

## III. LEGAL STANDARD

A. <u>Summary Judgment Generally</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect the

disposition of the case under the applicable law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248–49 (1986). A genuine question of material fact exists where, after reviewing the record as a whole, the court finds that a reasonable jury could return a verdict for the nonmoving party. *Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 434 (4th Cir. 2011).

In ruling on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990). The non-moving party may not oppose a motion for summary judgment with mere allegations or denial of the movant's pleading, but instead must "set forth specific facts" demonstrating a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

B.    Statute of Limitations for Breach of Contract Claims

While choice of law provisions, such as the Swedish law provision of the Agreement, govern substantive issues with the contract, the law of the forum state governs purely procedural issues. *Stern v. Shelley*, 781 F. Supp. 2d 281, 284 (D.S.C. 2011). A "statute of limitations, which requires an action to be brought within a fixed time following accrual of a cause of action, is generally procedural because it affects the remedy rather than the right." *Thornton v. Cessna Aircraft Co.*, 703 F. Supp. 1228, 1230 (D.S.C. 1988). Thus, the law of the forum ordinarily governs the selection and application of the appropriate statute of limitations. *Gattis v. Chavez*,

413 F. Supp. 33, 35 (D.S.C. 1976).

Courts in South Carolina apply their own statutes of limitations to actions sounding in contract. *Id.* Accordingly, a party has three (3) years from the time it knew or reasonably should have known that the alleged breach occurred to file suit. S.C. Code Ann. § 15-3-530(1) (2017). The aforementioned statute of limitations is modified by the "discovery rule" wherein "the statute of limitations [only] begins to run from the date the injured party either knows or should know, by the exercise of reasonable diligence, that a cause of action exists for the wrongful conduct." *True v. Monteith*, 489 S.E.2d 615, 616 (S.C. 1997). This rule does not require that the party have actual notice of the full extent of damages or of the claim itself; simply a party must act promptly to investigate the existence of a claim when facts and circumstances indicate that one might exist. *Brooks v. GAF Materials Corp.,* 284 F.R.D. 352, 357–58 (D.S.C. 2012), *amended in part*, 2012 WL 5195982 (D.S.C. 2012).

"Ordinarily, a defense based on the statute of limitations must be raised by the defendant through an affirmative defense, *see* Fed. R. Civ. P. 8(c), and the burden of establishing the affirmative defense rests on the defendant." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (external citation omitted).

### IV.  ANALYSIS

A.  <u>The Parties Arguments</u>

*1. Novus Defendants*

Novus Defendants move for summary judgment on Poly-Med's 'hernia only' breach of contract claims arguing that Poly-Med knew or had reason to know these claims existed at least by 2010. (ECF No. 209 at 7.) In support of their argument, Novus Defendants cite to aforementioned communications both sent and received by Poly-Med in 2010. Additionally,

Novus Defendants cite to observations made in emails by Poly-Med's Manufacturing Systems Coordinator on October 17, 2011,[7] and by its President on November 29, 2011.[8] Novus Defendants argue that these communications confirm that Poly-Med "was on notice of [Novus] Defendants' alleged making, selling, and/or using the Medical Device for an application other than hernia repair and that PMI believed [Novus] Defendants' actions breached the 2005 Agreement." Based on the foregoing, Novus Defendants assert that Poly-Med was on notice of the alleged "hernia only" breach by 2010, but did not file suit within three (3) years. (*Id.*)

Novus Defendants next assert that they are entitled to summary judgment on Poly-Med's "patent application" breach of contract claims because Poly-Med was expressly put on notice regarding alleged contractual violations in 2005 and 2010. (ECF No. 209 at 11.) As to these claims, Novus Defendants argue that "[i]f, as PMI asserts, the 2004 Radi Portfolio were subject to the 2005 Agreement and Defendants had a contractual duty under that 2005 Agreement to assign or transfer the 2004 Radi Portfolio's United States and European patent applications to PMI, to put those patent applications in PMI's name, and to advise and consult PMI regarding those patent applications, then PMI knew or had reason to know that a claim for 'patent application' breach of contract existed against Radi and then [Novus] Defendants as early as 2005." (*Id.* at 12 (referencing ECF No. 209-6 at 3).) Additionally, "on October 15, 2010, [Novus] Defendants put PMI on written notice that [Novus] Defendants, without consulting or advising PMI, had filed patent applications regarding mesh in [Novus] Defendant's name and not

---

[7] In an e-mail to Shawn Peniston, Poly-Med's Manager of Product and Process Development, Rebecca Ogburn stated her confusion in response to a comment made by Mrs. Dr. Shalaby that "we are to stick with WK6 in our documents because it was important to note that we only manufacture for hernia use despite what Novus markets for." (ECF No. 209-4 at 1.)
[8] Poly-Med's then President David Shalaby observed to Robert Grimes in an e-mail that he did not "want to make an issue this week but you should be aware that they only have license to the mesh for hernia use." (ECF No. 209-5 at 1.)

in PMI's name." (ECF No. 209 at 16 (referencing ECF No. 209-8 at 8)).) "Thus, in October 2010, PMI's original notice in 2005 was further enhanced, . . . [and] PMI was on notice and had reason to know that [Novus] Defendants had filed and were filing mesh patent applications" in violation of the Agreement. As a result, Novus Defendants also argue that Poly-Med's "patent application" breach of contract claims are also time-barred.

*2. Poly-Med*

Poly-Med argues that Novus Defendants are not entitled to summary judgment based on the statute of limitations for breach of contract because each breach of the Agreement occurring within three years before this action was filed had "its own limitations period." (ECF No. 216 at 12.) Poly-Med further argues that South Carolina law recognizes "continuous accrual in contract cases" such that "[s]eparate, recurring invasions of the same right constitute a continuous accrual, each triggering its own limitations period." (*Id.* (citing *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharm., Inc.*, 777 S.E.2d 176, 200 (S.C. 2015)).) As a result, Poly-Med asserts that Novus Defendants' "ongoing breaches of the Agreement preclude a determination that any of the Plaintiff's claims are barred by the statute of limitations." (*Id.* at 16.)

In support of its arguments, Poly-Med asserts that there were many breaches of the Agreement that it lacked knowledge of and could not reasonably have learned about until within three years before this action was filed. (ECF No. 216 at 6.) Poly-Med specifically asserts that the following nine breaches of the Agreement occurred "[w]ithin the three-year period immediately preceding this action" and while this action has been pending:

> "(1) promoting and selling hernia mesh for breast reconstruction; (2) manufacturing the mesh for breast reconstruction; (3) creating, manufacturing and selling a new mesh product for breast reconstruction; (4) filing patent applications on the mesh in their own name rather than Poly-Med's name; (5) assigning patents and patent applications from one Defendant to another; (6) prosecuting and maintaining patent applications and patents in their own name rather than in

11

> Poly-Med's name; (7) commercially exploiting patent applications and patents belonging to Poly-Med; (8) failing to transfer to Poly-Med patent applications, patents and know-how belonging to Poly-Med upon termination of the Agreement; and, (9) failing to turn over to Poly-Med all records and files regarding the maintenance and prosecution of patent applications and patents belonging to Poly-Med upon termination of the Agreement."

(*Id.* at 1–2.) In this regard, Poly-Med asserts that each of these breaches involve "recurring and ongoing violations," each triggering its own limitations period. (*Id.* at 16–17 (citing, *Dave & Buster's Inc. v. White Flint Mall, LLP*, 616 F. App'x 552, 558 (4th Cir. 2015)).)

B.  The Court's Review

A breach of contract action in South Carolina must be filed within three (3) years of the date the injured party either knows or should know that a claim exits. The crux of Novus Defendants' Motion for Summary Judgment requires the court to determine whether South Carolina in the breach of contract context recognizes the theory of "continuing breach," "continuing wrong" or "continuing accrual" (hereinafter collectively "continuing breach") wherein each discrete event of alleged breach individually starts a new limitations period. In this regard,

> A limitations period generally begins to run when facts exist that authorize one party to maintain an action against another. However, under the continuing tort or "continuing violation rule," where a tort involves a continuing or repeated injury, the limitations period does not begin to run until the date of the last injury or the date on which the tortious acts cease.
>
> In cases in which the parties plead as a single continuing event a series of distinct events, each of which gives rise to a separate cause of action, the "continuing claims doctrine" operates to save the later arising claims, even if the statute of limitations has lapsed for the earlier events. The continuing claims doctrine does not apply, however, to a claim based on a single distinct event which has ill effects that continue to accumulate over time.

54 C.J.S. Limitations of Actions § 132 (2012) (footnotes omitted). Therefore, if the court finds that continuing breach is recognized under South Carolina law, Poly-Med's claims alleging the

breach of the Agreement would not be barred by the statute of limitations merely because one or more of the alleged breaches occurred outside of the three year limitations period.

In support of its position that continuing breach "is recognized under South Carolina law," Poly-Med relies primarily on the *State ex. rel. Wilson* and *Dave & Buster's, Inc.* cases. The court reviewed these cases and observes that in *State ex. rel. Wilson*, the Supreme Court of South Carolina expressly limited its findings when it stated that "[w]e adopt the view that aligns with legislative intent as reflected in section 39–5–110, . . . that the SCUTPA statute of limitations begins to run anew with each violation." 777 S.E.2d at 200. "Indeed, the language of SCUTPA itself contemplates that an unlawful method, act, or practice may result in multiple statutory violations, and it is the violations themselves that cause the statute of limitations to begin to run." *Id.* (citing S.C. Code Ann. § 39-5-110(a) ("If a court finds that any person is willfully using or has willfully used a method, act or practice declared unlawful by § 39-5-20, the Attorney General . . . may recover on behalf of the State a civil penalty of not exceeding five thousand dollars per violation.")). Moreover, in *Dave & Buster's, Inc.*, the United States Court of Appeals for the Fourth Circuit was only tasked with interpreting Maryland law on breach of contract (*see* 616 F. App'x at 556), not the law of South Carolina:

> We think it important to note, however, that Maryland's theory of continuing breach of contract is a limited one. Here, the party to the contract that committed the breach was subject to an ongoing obligation to refrain from certain conduct and repeatedly or continuously engaged in that very conduct while the contract remained in effect. We do not, however, read the Court of Appeals of Maryland to be endorsing a wide-reaching continuous breach exception to the statute of limitations. Statutes of limitations "represent a public policy about the privilege to litigate" and "find their justification in necessity and convenience . . . [in order to] spare the courts from litigation of stale claims."

*Id.* at 557–58.[9]

---

[9] As further explained by the court in *Chevron U.S.A. Inc. v. Apex Oil Co., Inc.*, 113 F. Supp. 3d 807, 820 (D. Md. 2015), under Maryland law, "[t]he continuing harm doctrine tolls the statute of

In contrast to Poly-Med's cited caselaw, Novus Defendants point to the following decision of this court which they argue demonstrates that continuing breach is not applicable to a breach of contract claim in South Carolina:

> Plaintiff has attempted to advance the continuing tort doctrine as a means of tolling the statute in this case; however, this argument is unavailing. South Carolina has adopted the doctrine of continuing tort in limited situations involving nuisance actions, thereby allowing litigants to recover all damages for the continuing nuisance. *See Silvester v. Spring Valley Country Club*, 344 S.C. 280, 287, 543 S.E.2d 563, 567 (Ct. App. 2001) (citing *Sutton v. Catawaba Power Co.*, 104 S.C. 405, 89 S.E. 353. 408, 89 S.E. 353, 353 (1916)). However, South Carolina courts have clearly declined to adopt the continuing tort rule in other instances. *Harrison v. Bevilacqua*, 354 S.C. 129, 141, 580 S.E.2d 109, 115 (2003) ("We decline to adopt the continuous treatment rule or the doctrine of continuing tort."); *Epstein v. Brown*, 363 S.C. 372, 380, 610 S.E.2d 816, 820 (2005) ("we decline to adopt the continuous representation rule."). Plaintiff has failed to point [] the Court to any binding case law that establishes the doctrine's use by South Carolina courts in factual scenarios similar to those presented in this case.

*Ctr. for Legal Reform v. Rakowsky*, C/A No. 3:14-cv-01674-JFA, 2014 WL 6389709, at *4 (D.S.C. Nov. 14, 2014).

In expressing their contentions, the parties failed to cite to, and the court has not located, a South Carolina appellate court decision addressing the precise question of whether continuing breach is applicable under South Carolina law to extend the life of a breach of contract cause of action.[10] Thus, as a federal court sitting in diversity, this court "must predict how the South Carolina Supreme Court would decide the issue." *Allstate Ins. Co. v. Electrolux Home Prods.,*

---

limitations regardless of a potential plaintiff's discovery of the wrong." *Id.* (quoting *Litz v. Md. Dep't of Env't*, 76 A.3d 1076, 1089 (Md. 2013)). "Under this doctrine, 'every repetition of the wrong creates further liability and creates a new cause of action, and a new statute of limitations begins to run after each wrong perpetuated.'" *Id.* (quoting *Jones v. Speed*, 577 A.2d 64, 69 n.4 (Md. 1990)). "Accordingly, 'violations that are continuing in nature are not barred by the statute of limitations merely because one or more of them occurred earlier in time.'" *Id.* (quoting *Litz*, 76 A.3d at 1089).

[10] Additionally, neither Poly-Med nor Novus Defendants has requested certification of this issue to the South Carolina Supreme Court.

*Inc.*, C/A No.: 4:16-cv-03666-RBH, 2017 WL 2216298, at *5 (D.S.C. May 19, 2017) (citing *Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002) ("As a federal court sitting in diversity, we have an obligation to apply the jurisprudence of South Carolina's highest court, the South Carolina Supreme Court. But in a situation where the South Carolina Supreme Court has spoken neither directly nor indirectly on the particular issue before us, we are called upon to predict how that court would rule if presented with the issue." (internal footnote and citations omitted))). "In predicting a ruling by the South Carolina Supreme Court, [the Court] may also consider, inter alia: restatements of the law, treatises, and well considered dicta," *id.*, "as well as the practices of other states." *Id.* (quoting *St. Paul Fire & Marine Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 365 F.3d 263, 272 (4th Cir. 2004) (internal quotation marks omitted)).

While it does not appear that the specific issue of whether continuing breach is applicable under South Carolina law to extend the life of a breach of contract cause of action has been addressed by the South Carolina appellate courts, the court was able to locate decisions discussing the continuing breach theory. *Cf. Vieira v. Simpson*, No. 2:13-cv-2610-DCN, 2015 WL 1299959, at *7 n.7 (D.S.C. Mar. 23, 2015) ("Additionally, the court has also come up empty in its search for any South Carolina cases applying a continuing wrong theory to a tort claim."); *Anonymous Taxpayer v. S.C. Dep't of Revenue*, 661 S.E.2d 73, 81 (S.C. 2008) ("The circuit court gave two reasons for denying this argument: (1) because Appellant was alleging an impairment of contract action, not a breach of contract action, the statute of limitations began to run when any alleged contract was impaired by Act 189, not when Appellant was actually denied the exemption each year; and (2) the cause of action accrued when Act 189 was passed because at that point Appellant was put on notice that he had a cause of action. We agree with the circuit

court that there is no continuing breach which would start a new limitations period because the cause of action arose with the enactment of Act 189."); *Maher v. Tietex Corp.*, 331 S.C. 371, 500 S.E.2d 204, 211 (S.C. Ct. App. 1998) ("The objective test in South Carolina's discovery rule is sufficient to allow plaintiffs the opportunity to discover and act upon the original breach, without need for application of the 'continuing wrong' doctrine in this situation.") (citation omitted); *Dillon Cty. Sch. Dist. No. Two v. Lewis Sheet Metal Works, Inc.*, 332 S.E.2d 555, 560–61 (S.C. Ct. App. 1985) ("As far as we can determine, the Supreme Court of this state has never applied, at least not in a case involving either negligence, breach of warranty, or strict liability, the so-called 'continuous treatment' exception to the general rule governing the accrual of a cause of action. We doubt if the Supreme Court would do so, especially since the 'discovery' rule is applicable in South Carolina and is itself an exception to the traditional rule of accrual. Indeed, our research discloses no case adopting the 'continuous treatment' exception where the 'discovery' rule is in effect.") (internal citations omitted); *but see Companion Prop. & Cas. Ins. Co. v. Wood*, C/A No. 3:17-cv-00514-CMC, 2017 WL 4168520, at *8 (D.S.C. Sept. 20, 2017) ("In response, Companion argues the obligations at issue are recurring obligations that were not waived by prior non-enforcement . . . In light of the limitations noted above, the court finds the contract-based claims are not barred by the statute of limitations, at least not on motion to dismiss.").

Upon review of the foregoing, the court is persuaded that the South Carolina Supreme Court would conclude that because breach of contract claims in South Carolina are subject to the discovery rule, they are not subject to the continuing breach theory. *E.g.*, *CoastalStates Bank v. Hanover Homes of S.C., LLC*, 759 S.E.2d 152, 156 (S.C. Ct. App. 2014) ("The discovery rule applies to breach of contract actions.") (quoting *Prince v. Liberty Life Ins. Co.*, 700 S.E.2d 280,

282 (S.C. Ct. App. 2010)); *Maher*, 500 S.E.2d at 207 ("The discovery rule determines the date of accrual for a breach of contract action. Pursuant to the discovery rule, a breach of contract action accrues not on the date of the breach, but rather on the date the aggrieved party either discovered the breach, or could or should have discovered the breach through the exercise of reasonable diligence.") (internal and external citations omitted). Accordingly, based on the evidence viewed in the light most favorable to Poly-Med, the court concludes that Poly-Med should have known through the exercise of reasonable diligence that its "hernia only" and "patent application" breach of contract claims existed in September 2010 and October 2010, respectively. However, Poly-Med did not file its "hernia only" and "patent application" breach of contract claims until May 8, 2015 (*see* ECF No. 1), almost five (5) years later. For this reason, the court finds that Novus Defendants are entitled to summary judgment on Poly-Med's "hernia only" and "patent application" breach of contract claims because these claims are barred by the three (3) year statute of limitations found in S.C. Code Ann. § 15-3-530(1) (2017).

## V. CONCLUSION

Upon careful consideration of the entire record, the court hereby **GRANTS** the Motion for Partial Summary Judgment (ECF No. 209) of Defendants Novus Scientific Pte. Ltd., Novus Scientific, Inc. and Novus Scientific AB as to Poly-Med's "hernia only" and "patent application" breach of contract claims.[11]

**IT IS SO ORDERED.**

*J. Michelle Childs*
United States District Judge

April 24, 2018
Columbia, South Carolina

---

[11] The court is persuaded that all nine of the breaches alleged by Poly-Med fall into one of these two categories. (*See* ECF No. 216 at 1–2.) In this regard, the unavailability of information regarding the later occurring breaches alleged by Poly-Med does not delay the running of the limitations period under South Carolina law.